# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 02-2867

EVANSTON COMMUNITY CONSOLIDATED
SCHOOL DISTRICT NUMBER 65,

*Plaintiff-Appellant*,

*v.*

MICHAEL M. and CHRISTINE M., parents of JOHN M.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 1063—**Ronald A. Guzman**, *Judge.*

_____

No. 02-3001

JOHN M., by his parents and next friends,
MICHAEL M. and CHRISTINE M.,

*Plaintiffs-Appellants*,

*v.*

EVANSTON COMMUNITY CONSOLIDATED SCHOOL
DISTRICT NUMBER 65 and DR. HARDY RAY MURPHY,
its superintendent, sued in his official capacity,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 1052—**Ronald A. Guzman**, *Judge.*

_____

ARGUED MAY 29, 2003—DECIDED FEBRUARY 2, 2004
_____

Before CUDAHY, EVANS, and WILLIAMS, *Circuit Judges.*

PER CURIAM. The parents of John M. have brought this case, claiming that the Evanston Community Consolidated School District violated John's rights under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* Both sides have appealed portions of the district court decision.

The facts in this case are many and detailed, but we will attempt to avoid an endless and tedious recitation. In short, John has Downs Syndrome. During the 1999-2000 school year he was in third grade. He was in a regular classroom but received 400 minutes of special education services, including 150 minutes per week of speech and language resources, 30 minutes per week of direct occupational therapy (OT) services, and 60 minutes per month of physical therapy (PT) services. He also had a full-time teacher's aide.

In the spring of 2000, the District conducted its tri-annual evaluation of John to be used in the preparation of his individualized education program (IEP) for the 2000-2001 school year. The parents and the District disagreed about how to perform the evaluation. The parents refused to allow standardized assessment tools but eventually agreed on an evaluation procedure which did not use standardized testing. Based on evaluations by occupational therapist Cathy Duba and physical therapist Patricia Anderson, the District prepared John's IEP for 2000-2001. It proposed 30 minutes of OT consultation per week and 30-60 minutes of PT consultation per month. In addition, Special Services Director Dan Thompson added 30 minutes of direct PT services.

The parents were not happy with the proposed IEP and requested private OT and PT evaluations. The parents hired a therapist from Pathways, a private organization, to perform an evaluation in July 2000. Part of this evaluation involved the use of standardized tests in a "non-standardized way." The parents paid $800 for the Pathways evaluation.

Thompson believed that the District's evaluations were appropriate and rejected the request that the District pay for the private evaluation. Instead, Thompson requested a due process hearing. Consequently, a hearing was held before a due process hearing examiner, at which the School District prevailed on all issues except, in the examiner's words, two "technical violations." One of the violations involved the occupational therapist Duba. She had received her MA in OT in August 1999 and passed her licensing exam in March 2000, but she did not receive her license until May 2000. Under those circumstances she could legally work in the school district, but only with more supervision than she received. According to the hearing examiner, there was no indication that Duba did not do a good job, but, nevertheless, as compensation for the technical licencing problem, the examiner ordered 60 minutes per week of direct OT services be provided to John in addition to the amount already provided for in the IEP. The examiner also found that the social and emotional goals set out in the IEP "read like boilerplate." She ordered the District to do better. In all other respects the IEP was upheld.

The case then moved to the federal district court, where the judge considered the parties' cross-motions for summary judgment without additional evidence. He said the parents were entitled to damages in the form of one year of compensatory occupational therapy, $800 to cover the fee for the independent evaluation, the use of an "inclusion facilitator" if one is available at no cost to the District, and, because he

found them to be prevailing parties, to attorney fees and costs. The parents' motion for compensatory education as to physical therapy, speech therapy, reading, and math was denied. The School District's motion was granted upholding the IEP. The parties cross-appealed in this court and the appeals were consolidated for our consideration.

In general, the School District appeals the award of reimbursement to the parents for independent evaluations of John's abilities, the order for direct OT services to John, and the determination that the parents were the prevailing parties and are thus entitled to attorney fees in this action. In their cross-appeal, the parents contend that the School District committed procedural violations in drafting his IEP and that the School District has demonstrated its inability to provide adequate services without outside assistance from an expert who is authorized to supervise the IEP process.

The IDEA (and predecessor statutes) created a federal grant program to assist state and local agencies in educating disabled children. To receive funds, states must provide the children with the opportunity for a "free appropriate public education," or—because the situation calls out for another acronym—a FAPE. Each student must be offered special education and related services under an IEP. In *Board of Education v. Rowley*, 458 U.S. 176 (1982), the court set out a method for determining whether a school district has provided a FAPE: courts must ask whether the IEP is reasonably calculated to enable the child to receive an educational benefit and whether the district complied with the proper procedures for drafting the IEP.

In *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997), we discussed guidelines for district courts considering IDEA cases and noted that the standard of review "differs from that governing the typical review of

summary judgment." The IDEA says that the district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). So the court can take new evidence in addition to receiving and reviewing the administrative record. But when no new evidence is offered—as here—the cases are decided on summary judgment, which is the procedural vehicle for asking the judge to decide the case on the basis of the administrative record. *Hunger v. Leininger*, 15 F.3d 664 (7th Cir. 1994). Even though it is grounded on an administrative record, the decision must be based on a preponderance of the evidence, and the person challenging the decision of the agency bears the burden of proof. The district court must give "due weight" to the results of the administrative proceedings and must not substitute its "notions of sound educational policy" for those of the school district. *Heather S.*, 125 F.3d at 1053 (quoting *Rowley*). As *Rowley* pointed out, courts lack the specialized knowledge to resolve issues of educational policy. Once the school district has met the *Rowley* requirements, it has done enough. School districts are not required to do more than to provide a program reasonably calculated to be of educational benefit to the child; they are not required to educate the child to his or her highest potential. *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ.*, 41 F.3d 1162 (7th Cir. 1994).

When the case reaches us,

> [w]e review the district court's judgment as a mixed question of law and fact. While we thus review the ultimate determination de *novo*, in the absence of any mistake of law, we may only reverse the district court if its findings were clearly erroneous.

*Heather S.*, 125 F.3d at 1053.

A primary issue in this case involves occupational therapy. Ms. Duba, the therapist, was not licensed and so should have been better supervised. Because of what she called a "technical violation," the hearing examiner required the School District to provide compensatory services in the amount of 60 minutes per week of direct (not consultative) occupational therapy services.

The district court upheld that requirement, also seeming to agree that the licensing violation supported the compensatory services. But the district judge also said that the "evidence is undisputed that John needs direct occupational therapy services despite the due weight given to the Hearing Officer's decision" and "we agree with the Parents that the Hearing Officer erred by not affording any weight to the testimony of the independent therapists and as a result of such reached an erroneous decision." These findings would seem to support an order for direct OT services on the merits rather than as compensation for licensing violations.

The School District contends that neither basis for the OT services is valid. The technical violation does not support compensatory services, the School District says, because courts may order compensatory services under the IDEA only upon a finding that a school district failed to provide a FAPE. As to the merits of the issue, the School District contends that the hearing examiner's findings that the school had provided "an exemplary, inclusive education program" were supported by a preponderance of the evidence.

Compensatory services are well-established as a remedy under the IDEA. In *Board of Education of Oak Park & River Forest High School District 200 v. Illinois State Board of Education*, 79 F.3d 654, 656 (7th Cir. 1996), we said of the statute:

The only specific remedies that it mentions are attorneys' fees and interim relief (see below). But it authorizes the court to "grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(e)(2), and these courts have assumed, consistent with the Supreme Court's generous reading of the provision in *School Comm. of Town of Burlington v. Department of Education*, 471 U.S. 359, 369-70, 105 S.Ct. 1996, 2002-03, 85 L.Ed.2d 385 (1985), that this authorization encompasses the full range of equitable remedies and therefore empowers a court to order adult compensatory education if necessary to cure a violation. *Parents of Student W. v. Puyallup School District*, 31 F.3d 1489, 1497 (9th Cir. 1994); *Pihl v. Massachusetts Dept. of Education*, 9 F.3d 184, 187-89 (1st Cir. 1993).

Not every violation, of course, warrants compensatory relief. However, we disagree with the contention that the violations here are like the "procedural" problems in *Heather S.*, which primarily involved violations of the Wisconsin time limits for administrative actions; violations which were termed "minor." In this case, the so-called technical violation is a bit more serious than that. It is a violation involving the qualifications of the school personnel who are providing the services. Failure to follow the state's requirements for licensing occupational therapists, as set out in 225 ILCS 75/3(6)(I), is different from a minor procedural violation. Presumably, states maintain standards for educational personnel to help maintain adequate educational experiences for all students. A FAPE, surely, is an education provided by qualified personnel. In fact, specifically as to occupational therapy, 34 C.F.R. § 300.24(b)(5)(I) refers to "services provided by a qualified occupational therapist." While we are not so naive as to think that licensing ensures qualifications in all instances, to ignore licensing requirements is a step in the wrong direction.

Though it may be a close question, we affirm the order for compensatory occupational services.

We next consider the School District's contention that the parents are not entitled to compensation for the independent Pathways evaluation. They would be entitled to reimbursement for their private evaluations only if the District's PT and OT evaluations were not appropriate. *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. State Bd. Of Educ.*, 41 F.3d 1162 (7th Cir. 1994). The hearing examiner found that the School District's evaluations were appropriate. On the other hand, the district court found that the School District did not comply with a regulation which requires it to give the parents the "agency criteria" when they request an independent evaluation. The district court's finding is not supported by a preponderance of the evidence in the administrative record. Neither was new evidence offered to the district court to support a different conclusion. The parents are not entitled to reimbursement.

In the cross-appeal, the parents contend that the School District "seriously infringed" on their participation in the IEP process. Unlike the issue involving occupational therapy, this claim involves what more clearly are procedural violations in the process. Simply labeling a problem "procedural," however, does not end the discussion. We have made clear that certain procedural flaws violate a student's rights. In *Heather S.*, 125 F.3d at 1059, we quoted a Ninth Circuit case—*W.G. v. Board of Trustees*, 960 F.2d 1479, 1484 (1992)—which said that "procedural inadequacies that result in the loss of educational opportunity . . . clearly result in the denial" of a FAPE. The parents want us to go farther and adopt the rest of the *W.G.* language, which is that procedural inadequacies also violate FAPE if they "seriously infringe the parents' opportunity to participate in the IEP formulation process." *W.G.*, 960 F.2d at 1484. The parents here complain that the IEP conferences were rushed and insufficient—that is, that their opportunity to

participate in the process was infringed. The record does not support a finding that the parents' rights were in any meaningful way infringed. Considerable time was spent on trying to work out an IEP in conferences at which both the parents and their advocate participated. It follows, then, that this is not a proper case to extend *W.G.* as the parents request.

The parents also contend that the School District did not assess John's progress through achievement testing and that there was no explanation of why testing was not done. They also contend that there was no adequate statement of goals for John and that the IEP failed to adequately provide for his behavioral and social-emotional needs. We find that the record supports a finding that the IEP met the *Rowley* standards.

Finally, the parents contend that the School District cannot provide a FAPE to John without supervision, technical assistance, and training from an outside "Inclusion Facilitator" who would have authority to manage John's case, no matter what the cost. The hearing examiner rejected this contention and found that the school personnel were well-qualified and trained. The district court had ordered a facilitator only if there would be no cost to the School District. The School District points out that the parents themselves, in a letter, praised one teacher and said that a teaching assistant was very skilled, attentive, and dedicated to helping John reach his maximum potential. The IDEA, as we have said, does not require the School District to provide the best services possible, and we cannot find on this record that an outside facilitator was required.

This brings us to the question of attorneys' fees. The IDEA allows for discretionary grants of attorneys' fees under 20 U.S.C. § 1415(i)(3)(B), which provides:

> In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party.

The district court found that the parents were prevailing parties and, as such, entitled to an award of attorneys' fees from the District. However, the court did not set a precise dollar award pending this appeal.

Our review of the district court's decision regarding whether to award attorneys' fees is highly deferential, as we will reverse only for an abuse of discretion. *Monticello Sch. Dist. No. 25 v. George L. and Carolyn L.*, 102 F.3d 895, 907 (7th Cir. 1996). "An abuse of discretion is found only when reasonable persons could not take the view espoused by the district court." *Id.*

In the instant case, we cannot say that the district court abused its discretion, as reasonable persons could believe the parents were prevailing parties entitled to attorneys' fees. In *Board of Education of Oak Park Dist. 200 v. Nathan R.*, the court said:

> "Prevailing party" under 20 U.S.C. § 1415(e)(4)(B) has the same meaning as the phrase does in 42 U.S.C. § 1988. According to the Supreme Court, a prevailing party prevails under § 1988 if he obtains at least some relief on the merits of his claim such as an enforceable judgment, consent decree, or settlement.

199 F.3d 377, 382 (7th Cir. 2000) (citations omitted). "[A] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992). Here, the parents were awarded a significant amount of the relief they sought. The amount of

OT services increased from 30 minutes a week of consultative services to 60 minutes a week of direct services. Moreover, that the award was compensation for a so-called technical licensing violation does not mean that the parents did not prevail. After all, the "prevailing party inquiry does not turn on the magnitude of the relief obtained." *Id.* at 114.

Nonetheless, prevailing party status does not guarantee attorneys' fees, as a plaintiff's degree of success impacts the reasonableness of a fee award. *Monticello Sch. Dist. No. 25*, 102 F.3d at 907. In fact, this court has recognized that given a "simply technical or *de minimis*" victory, one may not be entitled to attorneys' fees at all. *See id.* In the instant case, the parents prevailed due to a "technical" violation. Because the violation was serious in nature and involved a primary issue in this case, we cannot say that the district court abused its discretion in finding that the parents were entitled to some amount of attorneys' fees. However, because the parents' win has been diminished, the district court should consider the amount of fees to be awarded (if fees are to be awarded at all) in light of the changed circumstances occasioned by this opinion.

The judgment of the district court is AFFIRMED as to the requirement for compensatory occupational therapy services, the requirement for an inclusion facilitator if it involves no additional expense to the District, the finding that the IEP was otherwise adequate, and the determination that the parents are the prevailing party for purposes of 20 U.S.C. § 1415(i)(3)(B). The judgment is REVERSED as to the award to the parents for the Pathways evaluation. The case is REMANDED to the district court for further proceedings consistent with this opinion. Each side shall bare its own costs.

EVANS, *Circuit Judge*, concurring in part, dissenting in part.  I join the majority opinion in all respects, except I would vacate the finding that the parents are the prevailing party and thus entitled to attorneys' fees.

America's public schools (and only public schools, of course, are subject to the IDEA) are in a financial bind. A dollar spent on one child is a dollar less to spend on others. This is a reality that the law should not ignore. It is a reality that should be kept in mind when awarding "prevailing party" status to those who sue school districts under the IDEA.

While perhaps no public school system in America is as troubled as the one in the District of Columbia (certainly not a district like Evanston's), what happened there in recent years is interesting to note. In 1998, that district paid over $10 million to attorneys for complaining parents in IDEA cases. For attorneys, the system became "a booming, lucrative industry." *See* Doug Struck and Valerie Strauss, "Special Ed Law is Big Business; Students' Attorneys Collectively Receiving Millions in Fees," *The Washington Post*, July 20, 1998, as quoted in *Calloway v. District of Columbia*, 216 F.3d 1 (D.C. Cir. 2000).

In noting what happened in the District of Columbia, I'm not suggesting that the attorneys in this case have done anything but provide very competent services to John M's parents. I am suggesting, however, that because financial demands on public school districts are getting harder and harder to meet, requests for attorneys' fees in cases like this, which drain taxpayer-funded districts of their ability to meet other needs, should get close attention from courts. We should also keep in mind that, unlike successful § 1983 cases which involve vindicating constitutional rights— often with global implications for other cases—IDEA suits usually involve only very targeted disputes over the fine-tuning of IEPs affecting only one student in one district.

Because of this, I suggest that in determining whether a party has prevailed under the IDEA, courts should be rigorous in enforcing the current standard. That standard says that a prevailing party must obtain relief that "materially alters the legal relationship between the parties," *Bd. of Educ. of Oak Park Dist. 200 v. Nathan R.*, 199 F.3d 377 (7th Cir. 2000). The requirement should have teeth. I submit that the standard, when properly applied, has not been satisfied in this case.

The district court's basis for granting fees, as expressed in its one-paragraph statement on the issue, was that the parents were prevailing parties because they "prevailed at the hearing with respect to Ms. Duba's license and in the case at hand with respect to the Inclusion Facilitator and two procedural violations." In this court, the only claim to survive is that, given the fact that her license had not been issued, Ms. Duba required more supervision. For that reason, and that reason only, the order for compensatory OT services has been affirmed. Although the order resulted in a benefit for John, it is important to note that it was not based on any significant deficiency in his IEP or, for that matter, in the services the School District was providing. It was only to make amends for the licensing problem. As I see it, this minor tinkering did not come close to "materially altering" the relationship between John's parents and the District. I also think even this benefit could probably have been achieved without litigation. The School District had already offered to provide increased OT services prior to the due process hearing; an offer which was rejected. In a letter of August 28, 2000, the District offered a number of concessions:

   (a) review the IEP OT and PT provisions and include direct OT services—although it believes the current provisions are appropriate and services may be appropriately delivered through consultation as currently indicated in the IEP;

   (b) review the social-emotional components of the IEP
       and include more explicit goals—although the District
       believes the current IEP includes appropriate discus-
       sion and goals in this area;

   (c) evaluate John's assistive technology needs and make
       appropriate modifications to the IEP, as necessary,
       although the parents did not raise this as an issue at
       the prior IEP meetings and the District believes the
       current IEP addresses computer technology, etc.; and

   (d) discuss the reimbursement of the independent OT/PT
       in the context of an overall resolution of this matter.

This offer is not, I agree, sufficiently specific for a court to say with absolute certainty that the School District was offering more than what the parents obtained by taking the case to war with the District. But if the offer had been pursued, the parents might very well have received then what they are getting now. For these reasons, I cannot conclude that the parents' modest "win" in this litigation materially altered the relationship between the parties. So on this aspect of the case, I respectfully dissent.

A true Copy:

        Teste:


                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*

USCA-02-C-0072—2-2-04